IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| GUY M.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 3:19-cv-00071 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| ANDREW M. SAUL, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Guy M. asks this Court to review the Commissioner of Social Security's final

decision denying his applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–

434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having

considered the administrative record, the parties' filings, and the applicable law, I cannot find

that the Commissioner's final decision is supported by substantial evidence. Accordingly, I

respectfully recommend that the decision be reversed and the case remanded under the fourth

sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Guy applied for DIB and SSI in October 2016, Administrative Record ("R.") 212–13, 219–27, ECF No. 7-1, alleging disability due to a left hip replacement, back problems, three herniated discs, and two "dead feet," R. 85, 92. He alleged that he became disabled on June 1, 2012. R. 85, 92. He was forty-four years old, or a "younger" person under the regulations, on his alleged disability onset date. *See* R. 85, 92; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied his claims initially in December 2016, R. 85–102, and upon reconsideration in April 2017, R. 105–26. In June 2019, Guy appeared with counsel and testified at an administrative hearing before ALJ Mark O'Hara. R. 42–60. A vocational expert ("VE") also testified at the hearing. R. 60–68.

ALJ O'Hara issued a partially favorable decision on December 3, 2018. R. 13–29. First, he found that Guy had not engaged in substantial gainful activity since June 1, 2012, and that he met the Act's insured-status requirements through December 31, 2013.[3] R. 20. At step two, he

---

[3] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Guy] must prove that [he] became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 655–56. Although Guy's insured status is not relevant to the SSI claim, *see Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014), he cannot be paid SSI benefits for any period before the month in which he filed that

found that Guy had, "at least in combination," three severe impairments: "obesity, back disorders, and status-post left total hip replacement (THR)/total hip arthroplasty (THA)." *Id.* At step three, he concluded that none of Guy's severe impairments, considered both alone and in combination, met or equaled any relevant Listing. R. 20–22 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02A, 1.04, 11.14). He then evaluated Guy's residual functional capacity ("RFC") and determined that he could perform the "full range[] of sedentary work,"[4] defined as lifting or carrying ten pounds occasionally and less than ten pounds frequently and standing or walking up to two hours and sitting about six hours in an eight-hour workday. R. 22–27; *see* 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374184, at *3 (July 2, 1996).

Based on this RFC finding and the VE's testimony, ALJ O'Hara concluded that Guy was unable to return to his past relevant work, which included positions as a town/highway maintenance worker, mill worker, and lawn technician. R. 27; *see* R. 62–63. Nonetheless, ALJ O'Hara considered Guy's RFC, age, education, and work experience and found that the Medical-Vocational Guidelines ("the Grids") directed a finding of "not disabled" prior to Guy's fiftieth birthday. R. 27–28 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.24–201.26, 201.18–201.20). When Guy turned fifty on April 7, 2018, however, the Grids directed a finding of "disabled." R. 28 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.10). ALJ O'Hara therefore denied Guy's DIB application because he was not disabled prior to his date last insured of December 31, 2013, and

---

application, 20 C.F.R. §§ 416.202, 416.501. *Earl O. v. Comm'r of Soc. Sec.*, No. 4:17cv54, 2018 WL 10807027, at *2 n.1 (W.D. Va. Nov. 13, 2018).

[4] "Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations." SSR 96-9p, 1996 WL 374185, at *3. The "majority of individuals . . . age 50 or older" limited to sedentary work will be presumed disabled. *Id.*; *see* 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.00.

granted Guy's SSI application in part, awarding benefits as of April 7, 2018. *Id.* He denied SSI

benefits for the period from October 2016 through March 2018. *See* R. 29.

The Appeals Council denied Guy's request for review, R. 1–4, thereby making ALJ

O'Hara's written decision "the final decision of the Commissioner" denying his DIB claim and

granting his SSI claim in part, R. 1. This appeal followed.

### III. Discussion

Guy raises two arguments. First, he challenges the ALJ's RFC determination. *See*

*generally* Pl.'s Br. 4–14, ECF No. 11. He argues that ALJ O'Hara failed to conduct a function-

by-function assessment of his work-related abilities, explain how the evidence supported the

RFC finding, and explain why the RFC conflicted with the medical opinions of record. *Id.* He

also contends that ALJ O'Hara should not have applied the Grids in this case, primarily because

the ALJ's sedentary RFC finding should also have included restrictions on "non-exertional"

functions like postural activities and exposure to workplace hazards. *Id.* Second, Guy argues that

ALJ O'Hara erred in evaluating his symptoms. *Id.* at 14–18. He argues, specifically, that ALJ

O'Hara's reasons for rejecting his claimed symptoms and limitations are not supported by

substantial evidence. *Id.* Guy's first argument is persuasive. Accordingly, I address his second

argument only briefly.

A.     *Summary*

1.     *Treatment Notes*

In November 2003, Guy injured his back while lifting a heavy object at work. R. 789,

1086–87. An MRI revealed bulging discs at L4-L5 and L5-S1, as well as degenerative changes at

"multiple levels." R. 789; *see also* R. 1087. In May 2005, Guy sustained another work-related

back injury. R. 789. He reported "difficulty walking," "severe recurrent pain down his left lower

extremity," and "numbness and tingling in his left foot." *Id.* An MRI revealed an "L5-S1 disc herniation . . . abutting the transversing nerve root." R. 790.

In July 2005, Wahid Baqaie, M.D., of Virginia Orthopaedic Center, performed an L5-S1 discectomy to repair Guy's herniated disc. R. 791–93, 1093–94. Initially, the surgery provided some relief. R. 776, 793. Guy's pain returned shortly thereafter, however, when he suffered two additional injuries. R. 793 (noting severe pain after using a seeder in his yard (Sept. 2005)); R. 794 (noting that Guy "reirritated his nerve" for the second time since surgery (Nov. 2005)). Updated MRI results "d[id] not show any acute herniation," R. 795, but did reveal "repeat impingement of his nerve root at L5-S1," R. 796. In November 2005, Dr. Baqaie referred Guy to interventional pain management for a transforaminal selective nerve block procedure. R. 776. Then, in January 2006, Dr. Baqaie performed an L5-S1 transforaminal lumbar interbody fusion. R. 796, 1096–97. This surgery was partially effective. Guy's leg pain largely resolved, but his back pain persisted. *See, e.g.*, R. 797–99. In May 2007, a CT scan of his lumbar spine showed "[f]ailed back syndrome status post anterior-posterior fusion L5-S1 with persistent left-sided S1 radicular symptoms." R. 782. In short, Guy had not yet fully healed from his January 2006 surgery. R. 782–83; *see also* R. 798–99 (noting incomplete fusion in 2006).

In April 2007, Guy visited David C. Evans, M.D., of Piedmont Family Practice, reporting back pain. R. 808. On exam, Dr. Evans noted that Guy was in moderate distress, had tenderness to palpitation in his lumbar region, and had diminished left leg extensor strength. R. 808. He diagnosed Guy with chronic lumbago and acute urgency of urination, noting that the latter could be "related to nerve damage." R. 808. He initially prescribed Neurontin, *id.*, and then substituted it for Lyrica and Vicodin soon thereafter, R. 810–14. In June 2007, a nerve conduction

("EMG/NCV") study ordered to assess pain in Guy's lower left extremity was normal and identified "no electrical evidence of a neuromuscular disease." R. 779–81.

Guy was still experiencing persistent back pain in 2009. *See, e.g.*, R. 385. Lyrica and Vicodin had been partially effective, but Guy was at times unable to afford Lyrica because of a lack of insurance. R. 392–94. Providers at Piedmont Family Practice repeatedly increased and changed Guy's pain medications, *see, e.g.*, R. 387–88, 392–94, 827–30, and Guy tried physical therapy and pain management "without much success," R. 392. In May 2009, Guy began treatment with Ash Diwan, M.D., at Piedmont Family Practice. R. 821. Dr. Diwan diagnosed Guy with chronic pain and "Disc Dis[order with] Myelopath [Not Otherwise Specified]." R. 822. He prescribed methadone, *see* R. 22, and later added oxycodone for breakthrough pain, R. 827–36.

Guy continued treatment with Dr. Diwan through 2018. From 2010 through mid-2012, his pain was "largely well controlled," but he consistently reported a pain level of six out of ten and his pain was worse in cold weather. *See* R. 841–901. Dr. Diwan continued to prescribe the same medications, adjusting them as needed. *Id.* He also added Pennsaid, Lidoderm, Zanaflex, and trazodone to Guy's treatment regimen. R. 838, 840. In July 2012, Dr. Diwan noted that Guy had "chronic pain post surgery," which increased with "activity/standing." R. 906. He had numbness in his legs down to his knees, but he had "no weakness." *Id.* Dr. Diwan advised Guy to "continue [his] current regimen for now," as the "meds enable[d him] to stay functional and work/sleep." *Id.* Treatment notes remained similar through the end of 2012. *See* R. 908–21.

In 2013, Guy was "stable" on methadone and oxycodone, reported a pain level of five to six out of ten, and had good mobility and sleep.[5] R. 362–67, 934–60. In April 2014, Guy reported pain in his left calf and swelling in his legs. R. 978. Noting that Guy smoked and "d[id] not ambulate much given [his] baseline pain," Dr. Diwan ordered a venous doppler scan of his left lower extremity. R. 978–80. The scan showed no evidence of deep vein thrombosis. R. 985. Dr. Diwan told Guy to elevate his legs, wear compression stockings, and take Lasix as needed. *Id.* Through the end of 2014, Guy continued to take methadone[6] and oxycodone and reported a pain level of four to six out of ten. R. 986–1024.

In February 2015, Dr. Diwan noted that Guy's "function remain[ed] fair" and that he was "active" despite "limited endurance." R. 1031–32. In April 2015, similarly, Guy was "stable" on methadone and oxycodone, but his pain was "ever present and [was] variable depending on activity." R. 351. Dr. Diwan repeatedly referred Guy to interventional pain management, but Guy was unable to afford such treatment. *See, e.g.*, R. 1033, 1042, 1050. That summer, Guy reported right-sided numbness with radiation into his right leg. R. 1050–61. A July 2015 MRI showed "[s]table L5-S1 fusion and laminectomy," "[m]ild disc space narrowing at L2-L3 and L3-L4," and "[m]oderate disc space narrowing at L4-L5." R. 433. Given Guy's "recurrent radicular s[ymptoms] and pain," Dr. Diwan continued his medications and again referred him to pain management for evaluation and possible steroid injections. R. 1067–70.

---

[5] In January 2013, Guy had a muscle spasm that caused severe pain. *See* R. 925–26. Treatment notes document, however, that this issue quickly resolved. R. 931–36. Guy's medical records show that, otherwise, his condition was generally stable throughout 2013. *See* R. 362–67, 934–60.

[6] In early 2014, Dr. Diwan recommended substituting Exalgo in place of Guy's methadone prescription. R. 962. Guy tried Exalgo for a short period, but Dr. Diwan switched him back to methadone after he suffered a severe adverse reaction to the medication change. *See* 359, 970–75.

In October 2015, Guy began treatment with Ketan Patel, M.D., at the National Spine & Pain Centers. R. 402. He reported "continuous, aching and severe" pain that averaged five out of ten in severity. *Id.* He also had numbness, weakness, tingling, a pins-and-needles sensation, and swelling, and he was experiencing "increased tripping and difficulty walking." *Id.* His pain was aggravated by sitting, standing, walking, lifting, bending forward, bending to either side, and cold/damp weather. *Id.* It was mitigated by sitting, standing, walking, avoiding strenuous activity, and taking pain medication. *Id.* On examination of Guy's lumbar spine, Dr. Patel noted reduced lordosis, diffuse tenderness to palpation, extension more limited than flexion, limited side bending, reduced strength, normal deep tendon reflexes, and abnormal sensation in the feet. R. 403. Guy had an antalgic gait and used an assistive device for walking. *Id.* Dr. Patel diagnosed Guy with chronic pain syndrome, postlaminectomy syndrome, other spondylosis with radiculopathy, other intervertebral disc degeneration, and intervertebral disc disorders with radiculopathy. R. 404. He ordered an MRI, surgical consultation, physical therapy, and continued pain management with Dr. Diwan. *Id.*

Later that month, Guy met with Thomas Mazahery, M.D., at OrthoVirginia, for surgical evaluation. R. 440–42. He reported bilateral leg pain and numbness, constant swelling in his legs, and constant numbness in his feet. *Id.* He was "ambulating with a cane" and reported "severe pain" when "weight c[ame] off his right foot." *Id.* Dr. Mazahery reviewed Guy's new MRI results and diagnosed him with L5-S1 pseudoarthrosis and lumbar radiculopathy of unknown etiology. R. 441. He did "not see a definitive source of [Guy's] pain," noted that he may not have "solid fusion" from his 2006 surgery, saw "no definitive sources of nerve compression," and wrote that Guy's symptoms were "out of proportion for what we see in the

MRI." *Id.* Dr. Mazahery ordered further testing and cortisone injections. *Id.* He did "not recommend surgical management," as he did not expect it to help. *Id.*

From January to August 2016, Dr. Diwan continued to prescribe methadone and oxycodone. R. 505–35. Guy consistently reported a pain level of four out of ten and was stable on his existing medications. *Id.* In August 2016, he returned to Dr. Patel. R. 581. He reported that his symptoms had "worsened," his "feet and toes [were] constantly burning," and his left hip had become "very painful" and "weak." *Id.* His pain was "worse in the morning," and he could not function without pain medication. *Id.* On exam, Dr. Patel noted that Guy used an assistive device, had a "shuffling, antalgic gait," was tender to palpitation in the lumbar region, had limited range of motion, and had paraspinal muscle spasms. R. 582–83. Given Guy's "increased pain," Dr. Patel recommended an updated MRI and an EMG/NCV study, prescribed gabapentin "for neuropathic pain and restorative sleep," and ordered hip X-rays. R. 583–84. In September 2016, Dr. Patel noted abnormal MRI findings, including a "severe degree [of] left foraminal narrowing at L2-L3, . . . [a] broad-based posterior disc bulge and facet/endplate spurring resulting in severe right foraminal stenosis," and an abnormal left hip X-ray, suggesting "avascular necrosis." R. 596. Accordingly, Dr. Patel referred Guy for surgical consultation. *Id.*

A week later, Guy began treatment John J. Kim, M.D., of Northern Virginia Orthopaedic Specialists. R. 557–58. An MRI showed "[c]hronic appearing avascular necrosis," moderate osteoarthritis, and a moderate joint effusion in Guy's left hip. R. 461. It also revealed a "tiny amount of right hip avascular necrosis without collapse or significant osteoarthritis" and "mild bilateral sacroiliac joint osteoarthritis." *Id.* Guy had significant pain, was ambulating with a cane, was "very uncomfortable" even when sitting, and had a "significantly limited" range of motion. R. 556. Dr. Kim determined that a "total [left] hip arthroplasty" was Guy's "only option." *Id.* He

10

performed the surgery in November 2016, R. 559–60, and Guy's left hip pain resolved shortly

thereafter, *see* R. 553, 651, 656, 662, 683. Guy continued to use a cane, but he was "more

comfortable walking" and was "doing well" with physical therapy. R. 553.

In June 2017, Guy returned to Dr. Patel and reported that his symptoms were not well

controlled. R. 677. Dr. Patel noted that Guy was experiencing lower back pain, right leg pain,

peripheral neuropathy with axonal loss, "progressive symptoms" in his hands that could be either

neuropathy or carpal tunnel disease, and spondylotic and discogenic disease. R. 680. He ordered

an updated EMG/NCV study and suggested that spinal cord stimulation could provide relief if

other treatment options failed. *Id.* Ultimately, Guy did not obtain new EMG/NCV results because

he was unable to afford the study. *See* R. 772.

From July 2017 through April 2018, Guy continued treatment with Dr. Diwan. R. 707–

75. Dr. Diwan recommended gradually reducing Guy's dependence on methadone pursuant to

federal guidelines on opioid usage. *See, e.g.*, R. 712, 720. He noted, however, that prior attempts

to do so had "adversely affected [Guy's] function to [a] large degree," including by impacting his

activities of daily living. R. 712. Dr. Diwan also noted that Guy might be a candidate for an

inter-catheter ("IT") drug pump if he were unable to tolerate the medication reductions. R. 712,

733, 743. Initial reductions in Guy's medication dosages were "tolerable." R. 718. Guy had

"increased pain," but "no changes in function, mobility, sleep []or mood." R. 751. By April

2018, however, Guy was experiencing "heightened pain and some mild withdrawal

s[ymptoms]." R. 772. He was "essentially off methadone," R. 774, but he was still taking

oxycodone, and he reported increasing left hip and right ankle pain, R. 772. Dr. Diwan

recommended a new regimen of Xtampza and oxycodone. R. 774.

    2.    *Medical Opinions*

In December 2016, on initial review for DDS, Richard Surrusco, M.D., opined that Guy could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; he could stand/walk for two hours and sit for about six hours in an eight-hour workday; he needed a medically-required hand-held assistive device for ambulation; he could only occasionally push/pull with his left foot; he could occasionally climb ramps/stairs, balance, stoop, kneel, and crawl; he could never crouch or climb ladders/ropes/scaffolds; and he had to avoid concentrated exposure to extreme cold, vibrations, and hazards. R. 98–100. In April 2017, on reconsideration for DDS, Patricia Staehr, M.D., determined that Guy's physical functional abilities were somewhat more limited. *See* R. 111–13. She opined that Guy could lift and carry ten pounds occasionally and frequently; he could stand/walk for two hours and sit for about six hours in an eight-hour workday; he needed a medically-required hand-held assistive device for ambulation; he could only occasionally push/pull with his bilateral lower extremities; he could occasionally climb ramps/stairs, balance, stoop, and kneel; he could never crouch, crawl, or climb ladders/ropes/scaffolds; and he had to avoid concentrated exposure to vibration and hazards. R. 111–12.

3.    *Guy's Statements*

In November 2016, Guy submitted a Function Report to DDS. *See* R. 275–82. He reported that he lived alone in a twelve-by-twelve foot tool shed and did "absolutely nothin[g]" all day. R. 275. He explained that he tried to "stay away from others" because he was "always in pain," which frustrated him. R. 280. He could attend to most of his personal care needs, but he needed someone to bring him a bucket of water for washing and for making coffee. R. 276–77. He made quick meals such as a sandwich or a can of tuna. R. 277. He no longer cooked, did chores, or helped with yard work because of the pain he experienced while standing. R. 277–78.

He had tried to mow his lawn, but this "cause[d] extreme pain." R. 278. His wife cleaned his

laundry and brought it out to his tool shed. R. 277. Guy could sleep for only about forty minutes

at a time before having to "move to change [his] pain level." R. 276. He used to enjoy fishing,

hunting, metal detecting, and playing catch with his kids, but he could no longer do so. R. 279.

He spent most of his time watching television, went outside once or twice a day for fresh air,

could drive "very short distances," and went shopping about once per month. R. 278–79. On a

"good day," Guy could walk "about 50 yards" before resting for five minutes. R. 280.

In June 2019, Guy testified at the hearing before ALJ O'Hara. R. 42–60. He explained

that he had experienced back pain for close to twenty years. R. 44–45. He had undergone two

lumbar surgeries without relief, and his doctors were unable to perform further surgery. R. 45–

46. He had tried physical therapy, visited specialists, and been in pain management for years. R.

46. No course of treatment provided significant relief. R. 46–47. Guy explained that he could lift

only five to ten pounds regularly, was constantly changing his position to alleviate pain, and had

to lie down four or five times a day, for twenty to thirty minutes each, to elevate his feet and

knees. R. 48–50. He tried to help around the house by making dinner, washing dishes, or

cleaning the kitchen, but he ultimately spent most of his time alone, watching television. R. 50–

51. His sons handled most of the yard work. R. 51. He could no longer participate in social

activities, he watched religious services on television, and he drove only short distances once a

week. R. 52, 54. He did not feel that he could have maintained regular work attendance at any

point since 2012. R. 52.

B.    *The ALJ's Decision*

At step two, ALJ O'Hara found that Guy had, "at least in combination," three severe

impairments: "obesity, back disorders, and status-post left total hip replacement (THR)/total hip

arthroplasty (THA)." R. 20. At step three, ALJ O'Hara concluded that none of Guy's

impairments, considered both alone and in combination, met or equaled any relevant Listing. R.

20–22 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02A, 1.04, 11.14).

Next, ALJ O'Hara evaluated Guy's RFC and determined that he could perform the "full

range[] of sedentary work," defined as lifting or carrying ten pounds occasionally and less than

ten pounds frequently, and standing or walking up to two hours and sitting about six hours in an

eight-hour workday. R. 22–27. He considered Guy's symptoms,[7] but he determined that Guy's

"allegations regarding the severity of his symptoms and limitations" were not consistent with the

objective medical and other evidence. R. 24–25. ALJ O'Hara explained that Guy had undergone

"routine, conservative, and unremarkable" treatment, had not required surgery aside from his left

hip replacement, and had taken medications that were "relatively effective in controlling his

symptoms." R. 25. Moreover, Guy had "no significant or ongoing treatment by an orthopedic,

neurology, or pain management specialist," had not required hospitalization for his severe

impairments, and had relatively normal findings on exam. *Id.* ALJ O'Hara further found that

Guy's use of an assistive device was not medically necessary, that the record did not support his

alleged need to elevate his legs, that Guy had "not been entirely compliant in using prescribed

medications or in following prescribed treatment," and that Guy had made "inconsistent

statements" that undermined his credibility. R. 25–26.[8]

---

[7] "Symptoms" are the claimant's own description of his medical condition. 20 C.F.R. §§ 404.1502(i), 416.902(n).

[8] Because Guy's first argument warrants reversal and remand, I do not address in detail his second argument–that ALJ O'Hara improperly discounted Guy's symptoms. Nevertheless, I question whether ALJ O'Hara's evaluation of Guy's symptoms is supported by substantial evidence. For example, ALJ O'Hara found that Guy had "no significant or ongoing treatment by an orthopedic, neurology, or pain management specialist," R. 25, despite evidence that Guy's primary care physician prescribed opioid pain medication for approximately ten years, *see generally* R. 347–85, 473–547, 651–70, 683–775, 821–1080,

ALJ O'Hara also summarized the relevant medical evidence and the DDS physicians' opinions. R. 24, 26. He noted that, regarding Guy's DIB application, both DDS physicians opined that the record contained "insufficient evidence of a severe impairment from the [alleged] onset date through the [DLI]." R. 26. He also noted that, regarding Guy's SSI application, the DDS physicians both opined that Guy could perform sedentary work with additional limitations. R. 26. ALJ O'Hara "generally adopted" their opinions, finding them "consistent with the other credible evidence of record." *Id.* He also noted that "[n]o treating or examining medical source ha[d] opined" that Guy could not perform the full range of sedentary work. R. 27.

"Based on the foregoing," ALJ O'Hara wrote, "the undersigned finds that the claimant has the above [RFC of the full range of sedentary work], which is supported by the objective medical evidence of record and the opinions of the DDS disability expert physicians." R. 27. He then applied the Grids and found Guy "not disabled" before his fiftieth birthday. R. 27–28.

C.    *Analysis*

Guy challenges the RFC assessment. He argues that ALJ O'Hara failed to properly assess his functional abilities and did not explain how he determined that Guy could perform the full

---

and repeatedly referred him to interventional pain management, which he was often unable to afford, *see, e.g.*, R. 347, 707, 998, 1003, 1008, 1017. Guy also treated with Dr. Patel, at the National Spine and Pain Centers, from October 2015 through June 2017, *see* R. 402–04, 581–85, 593–97, 622–25, 677–80, and saw Dr. Kim, at Northern Virginia Orthopaedic Specialists, from September 2016 through December 2016 for his total hip arthroplasty, *see* R. 553–58. Likewise, ALJ O'Hara characterized Guy's treatment as "routine, conservative, and unremarkable," R. 25, despite evidence that Guy's medical conditions required him to take powerful pain medications, *see, e.g.*, R. 347, endure two back surgeries and one total hip replacement, R. 559–60, 791–93, 796, and have cortisone injections, R. 402, 441, a nerve block, R. 776, and other treatment. *See Lewis*, 858 F.3d at 868–69 (finding ALJ's determination that claimant's treatment was "'conservative' amount[ed] to improperly 'playing doctor'" where treatment included powerful analgesics, multiple surgeries, a lumbar injection, two nerve blocks, and a nerve ablation). On remand, the ALJ should reconsider "all the available evidence" and reevaluate "the intensity and persistence" of Guy's symptoms "and the extent to which [they] affect[ed] [his] ability to work" prior to April 7, 2018. *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996) (citing 20 C.F.R. §§ 404.1529(c)(1)–(2), 416.929(c)(1)–(2)).

range of sedentary work. *See generally* Pl.'s Br. 4–10. He also contends that ALJ O'Hara should not have applied the Grids to deny benefits prior to his fiftieth birthday. *Id.* at 6–7. He notes that the DDS physicians opined that he required additional limitations, and he argues that ALJ O'Hara failed to explain why he declined to include such limitations in the RFC. *Id.* at 8, 10–11. He also argues that the Grids should not be "treated as conclusive" when a claimant has both exertional and nonexertional impairments. *Id.* at 7 (quoting *Coffman*, 829 F.3d at 518). I agree.

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ's decision must provide a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, logically explaining how he weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Thus, a proper RFC analysis has three components: (1) all relevant evidence considered under the correct legal standard, (2) an accurate and logical explanation of how the evidence supports the ALJ's findings, and (3) conclusion. *See Thomas*, 916 F.3d at 311; *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017). "The second component, the ALJ's

logical explanation, is just as important as the other two. Indeed, [binding] precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Thomas*, 916 F.3d at 311 (citing *Woods*, 888 F.3d at 694). A reviewing court that "cannot gauge the propriety of the ALJ's RFC assessment" typically "cannot say that substantial evidence supports the ALJ's denial of benefits." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663–64 (4th Cir. 2017).

The RFC finding is crucial to the proper adjudication of an individual's disability claim. SSR 96-8p, 1996 WL 374184, at *3 ("Initial failure to consider an individual's ability to perform the specific work-related functions [of a particular exertional level] could be critical to the outcome of a case."). The RFC is used at step four to assess whether the claimant can perform past relevant work. *Id.* at *3–4. And it is used at step five, where the Commissioner bears the burden of demonstrating that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at *4 (noting that failure to properly determine the RFC "could result in an improper application of the [Grids] . . . and could make the difference between a finding of 'disabled' and 'not disabled'").

The Commissioner commonly satisfies his burden at step five through testimony of a VE that identifies specific occupations offering a significant number of jobs in the national economy that a hypothetical individual with the claimant's RFC and vocational profile could perform. *Lewis*, 858 F.3d at 862. Alternatively, in some cases, the Commissioner may satisfy his step five burden by reference to the Medical-Vocational Guidelines ("the Grids"). *See Aistrop v. Barnhart*, 36 F. App'x 145, 146 (4th Cir. 2002). The Grids are published tables and administrative rules that can be used in certain cases to "direct[] a conclusion [at step five] as to whether the individual is or is not disabled." 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a). In

such cases, they help streamline the disability determination by providing competent evidence that a significant number of jobs exist (or do not exist) in the national economy that the claimant can perform considering his or her exertional RFC and vocational profile.[9] *See id.* § 200(a), (d). The Grids may obviate the need for testimony from a VE.

Importantly, however, the Grids are dispositive of whether the claimant is disabled only where "the claimant suffers from purely exertional impairments."[10] *Aistrop*, 36 F. App'x at 146. The Commissioner may rely on the Grids alone to direct a finding of "Not Disabled" only in cases where the claimant retains the physical strength to perform "the full range of work at a given exertional level." *Id.*; *see also* 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Golini v. Astrue*, 483 F. App'x 806, 808 (4th Cir. 2012) (per curiam).Where the claimant "suffer[s] from nonexertional impairments" or from "a combination of exertional and nonexertional impairments," the Grids "may be used only as a guide," and the Commissioner "must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform." *Aistrop*, 36 F. App'x at 146–47; *see also Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983) (in such cases, the Grids are "not conclusive" and "full individualized consideration must be given to all relevant facts of the case"); 20 C.F.R. §§ 404.1569a(c)–(d), 416.969a(c)–(d).

Here, ALJ O'Hara's error is two-fold. He did not adequately explain how he determined

---

[9] The resulting figure is called "the person's remaining occupational base." SSR 83-12, 1983 WL 31253, at *1 (Jan. 1, 1983).

[10] The regulations broadly classify functional limitations as either "exertional" or "nonexertional." *See* 20 C.F.R. §§ 404.1569a(a), 416.969a(a). "The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* Other limitations "are considered nonexertional." *Id.* Nonexertional limitations include, among other things, environmental and postural limitations. *Id.* §§ 404.1569a(c)(1)(v)–(vi), 416.969a(c)(1)(v)–(vi); SSR 96-9p, 1996 WL 374185, at *5.

Guy's RFC, and he then based his application of the Grids, at step five, on his faulty RFC

determination. First, ALJ O'Hara's RFC assessment is fundamentally flawed because he failed to

build an "accurate and logical bridge," *Woods*, 888 F.3d at 694, between the relevant evidence

and his conclusion. The ALJ did not adequately explain how he concluded, from the available

evidence, that Guy could perform the full range of sedentary work without any nonexertional

limitations. ALJ O'Hara discussed Guy's symptoms, R. 23, 25–26, summarized some of the

relevant medical evidence, R. 24, and summarized the DDS physicians' medical opinions, R. 26.

He also noted that "[n]o treating or examining medical source ha[d] opined that [Guy was] more

limited than the above [RFC]." R. 27. He then simply stated that his RFC finding was "supported

by the objective medical evidence of record and the opinions of the DDS disability expert

physicians." *Id.* He did not explain how he determined that Guy had no nonexertional limitations

or how he concluded that Guy had no exertional limitations that would preclude him from

performing the full range of sedentary work. Without an explanation connecting his summary of

the evidence to his conclusion, ALJ O'Hara's decision leaves the Court to guess as to how he

determined the particular limitations of Guy's RFC.

    Notably, ALJ O'Hara's finding that Guy could perform the "full range[] of sedentary

work," R. 22, conflicts with the only two medical opinions[11] of record. An ALJ is not required to

---

[11] "Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect
the source's judgments about the nature and severity of the claimant's impairment, including her
symptoms, prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1),
416.927(a)(1). The ALJ must adequately explain the weight afforded to every medical opinion in the
record, taking into account factors such as the nature and extent of the source's treatment relationship
with the claimant; how well the source explained or supported the opinion; the opinion's consistency with
the record as a whole; and whether the opinion pertains to the source's area of specialty. *Id.* §§
404.1527(c), 416.927(c). A reviewing court "must defer to the ALJ's assignments of weight" among
differing medical opinions unless her underlying findings or rationale "are not supported by substantial
evidence" in the record, *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015), or they were reached by
means of an improper standard or misapplication of the law, *see Coffman*, 829 F.2d at 517.

"wholesale" adopt every functional limitation included in the medical opinions of record. *Geisler v. Comm'r, Soc. Sec. Admin.*, No. SAG-14-2857, 2015 WL 4485459, at *2 (D. Md. July 21, 2015) (finding ALJ did not err by declining to adopt functional limitations articulated in medical opinions he gave "moderate" and "significant" weight). But when the RFC "conflicts with an opinion from a medical source," the ALJ must resolve the conflict between the two by explaining why he chose not to adopt the medical opinion. SSR 96-8p, 1996 WL 374184, at *7. Here, both DDS physicians determined that Guy had postural, environmental, and lower extremity push/pull limitations. *See* R. 26. ALJ O'Hara acknowledged this, summarizing the DDS physicians' opinions in his decision. *Id.* He also "generally adopted" their opinions, noting that they were "experts in all phases of disability evaluation," were "well-qualified to render an opinion regarding the nature and severity of the claimant's impairments," and that their opinions were "consistent with the other credible evidence of record, including treatment notes and imagery and testing results." *Id.* Nonetheless, ALJ O'Hara did not include any postural, environmental, or push/pull limitations in the RFC, [12] and he did not explain why he declined to do so. It is unclear whether ALJ O'Hara determined that Guy did not have such limitations or merely omitted them because he believed (incorrectly) that they would not affect the sedentary job base under the Grids. Because ALJ O'Hara did not explain his reasoning, I cannot find his decision to be supported by substantial evidence. *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)

---

[12] The additional limitations the DDS physicians identified do not fall within the "full range[] of sedentary work." R. 22. Postural and environmental limitations are nonexertional. *See* 20 C.F.R. §§ 404.1569a(c)(1)(v)–(vi), 416.969a(c)(1)(v)–(vi); SSR 96-9p, 1996 WL 374185, at *5 (July 2, 1996). Thus, they do not fall within the regulatory definition of sedentary work. 20 C.F.R. §§ 404.1567(a), 416.967(a). Push/pull limitations are exertional. 20 C.F.R. §§ 404.1569a(a), 416.969a(a). But they also fall outside of the regulatory definition of sedentary work. *See* 20 C.F.R. §§ 404.1567(a)–(b), 416.967(a)–(b) (defining "light" work to include "some pushing and pulling of arm or leg controls," while defining "sedentary" work to include no similar requirement).

("[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review"); *Ezzell v. Berryhill*, 688 F. App'x 199, 201 (4th Cir. 2017) (per curiam) (remanding where ALJ gave a medical opinion "significant weight" because it was "consistent with the clinic record" and "accurately describe[d] the functional impact" of the claimant's impairments, but did not explain why he nonetheless "implicitly" rejected a cane-use requirement included in the opinion) (alteration in original).

This error also affected ALJ O'Hara's conclusion, at step five, that Guy was "not disabled" prior to his fiftieth birthday. ALJ O'Hara applied the Grids in this case. *See* R. 27–28. But because he had not properly determined whether Guy had postural, environmental, and/or push/pull limitations that could have made him capable of *less* than the full range of sedentary work, his application of this Grids was improper. ALJ O'Hara elicited testimony from the VE, who opined that the relevant limitations would not generally impact the sedentary job base:

> ALJ: Now isn't it true . . . that postural activities in general do not have an impact on the sedentary job base?
>
> VE: Yes, sir.
>
> ALJ: And environmental restrictions in general do not have an impact on the sedentary job base?
>
> VE: Yes.
>
> ALJ: Does occasional push/pull of the lower extremities have an impact on the sedentary job duties?
>
> VE: No, sir.
>
> ALJ: Therefore, notwithstanding such limits there's still a full range of sedentary work?
>
> VE: Yes, sir.

*See* R. 66–67. This testimony was partly accurate. An individual who can perform sedentary work with additional limitations may not necessarily be disabled within the meaning of the Act. *See Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984) (noting that "not all nonxertional conditions or limitations" erode the exertional level job bases); SSR 96-9p, 1996 WL 374185, at *4 (noting that even if an individual's exertional or nonexertional capacity permits him to do *less* than the full range of sedentary work, he is not necessarily disabled). Indeed, Social Security Ruling 96-9p provides that postural, environmental, and push/pull limitations do not have a significant impact on the sedentary job base. SSR 96-9p, 1996 WL 374185, at *7 ("Postural limitations . . . would not usually erode the occupational base for a full range of unskilled sedentary work significantly because [postural] activities are not usually required in sedentary work."); *id.* at *8 (noting that certain environmental restrictions, including "avoid[ing] all exposure" to "extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards," "would not, by [themselves], result in a significant erosion of the [sedentary] occupational base"); *id.* at *6 ("Limitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base.").

ALJ O'Hara appears to have justified his reliance on the Grids by eliciting VE testimony that Guy would still be able to perform the full range of sedentary work *even if* he included push/pull, postural, and environmental limitations in the RFC finding. This approach gets things backwards. SSR 96-9p states that such restrictions generally do not significantly erode the sedentary job base. 1996 WL 374185, at *4–8. But it also makes clear that such limitations *can*, depending on their type and severity in each individual case, eliminate an individual's ability to perform sedentary work. *See id.* at *6–9; *see also* SSR 83-14, 1983 WL 31254, at *1–2 (Jan. 1, 1983) (explaining how nonexertional limitations can impact the sedentary job base); SSR 83-12,

1983 WL 31253, at *2 (explaining how exertional limitations that do "not coincide with the definition of any one of the" exertional levels can erode the occupational base). Thus, it is critical that the ALJ properly determine a claimant's RFC *before* questioning a VE. SSR 96-9p, 1996 WL 374185, at *6 ("An accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource."); *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments.").

Instead of relying on testimony that the relevant limitations "generally" do not impair the sedentary job base, ALJ O'Hara should have properly considered whether and to what extent Guy has such impairment-related limitations. Had he adequately explained that the record did not support any such limitations (notwithstanding two DDS physicians' medical opinions) and otherwise supported his conclusion that Guy was capable of the "full range of sedentary work" with substantial evidence, ALJ O'Hara could have relied solely on the Grids, without needing testimony from a VE, to determine that Guy was not disabled. *See Aistrop*, 36 F. App'x at 146; 20 C.F.R. §§ 404.1569a(b), 416.969a(b). Alternatively, had he determined that Guy did have such limitations and incorporated them in the RFC, ALJ O'Hara could then have called a VE to testify that despite a relatively restrictive RFC, Guy could still perform specific jobs existing in significant numbers in the national economy. *See Aistrop*, 36 F. App'x at 146–47; 20 C.F.R. §§ 404.1569a(c)–(d), 416.969a(c)–(d). But ALJ O'Hara did neither. Instead, he improperly assessed Guy's functional impairments, and then he relied on VE testimony to show that this improper

assessment was immaterial. Accordingly, remand is warranted. *Grant*, 699 F.2d at 192 (reversing and remanding where, although claimant presented "considerable evidence . . . [of] nonexertional impairments," the ALJ "made no specific findings as to whether or not they indeed exist[ed]" and, consequently, improperly applied the Grids to find claimant "not disabled").

*

I take no position on whether Guy is entitled to disability benefits for the relevant period. But this Court must not "reflexively rubber-stamp [the] ALJ's findings." *Lewis*, 858 F.3d at 869. ALJ O'Hara erred in determining Guy's RFC and erred, at step five, in applying the Grids to determine that Guy was "not disabled" before April 7, 2018. Accordingly, I cannot find that his decision was supported by substantial evidence. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Guy cannot prove he was disabled before April 7, 2018, based on the medical evidence alone, provide a logical link between the evidence the Commissioner found credible and the RFC determination. In particular, the Commissioner must reassess the "the intensity and persistence" of Guy's symptoms and reevaluate "the extent to which [they] affect[ed] [his] ability to work" before April 7, 2018. *Craig*, 76 F.3d at 595; *see supra* n.8.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Guy's Motion for Summary Judgment, ECF No. 10, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 14, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 2, 2021

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge